## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

**JORDAN BOAZ**, an individual;

      Plaintiff,

v.

**ADAMS COUNTY SCHOOL DISTRICT NO. 12**, a Colorado school district, a/k/a Adams 12 Five Star Schools,

**BOARD OF EDUCATION, ADAMS COUNTY SCHOOL DISTRICT NO. 12**, a/k/a Adams 12 Five Star Schools Board of Education;

**ERIC ENGLAND**, individually and in his official capacity as a teacher with the District;

**KIM BRADY**, individually, and in her official capacity as a principal at Horizon High School ("Horizon" or "HHS"), which is under the aegis of the District;

**KATIE ROMERO**, individually and in her official capacity as an assistant principal at Horizon;

**CHRIS GDOWSKI**, individually and in his official capacity as superintendent of the District;

and

**PAMELA SMILEY**, individually and in her official capacity as the former principal at Horizon;

      Defendants.

---

## COMPLAINT WITH JURY DEMAND

---

Plaintiff Jordan Boaz ("Boaz"), who appears individually, hereby respectfully files this action against the Defendants Adams 12 Five Star Schools (the "District"), Adams 12 Five Star Schools Board of Education (the "Board"), Eric England ("England"), Kim Brady ("Brady"), Katie Romero ("Romero"), Pamela Smiley ("Smiley") (collectively, "Defendants"), through the

undersigned counsel of record Kishinevsky & Raykin, Attorneys at Law, and states on information and belief as follows.

## I.       NATURE OF THE CASE

1.       This is a civil action seeking declaratory, injunctive and other appropriate equitable relief to enjoin and restrain the deprivation, under color of state law, of plaintiff's rights, privileges, and immunities guaranteed by the Constitution and law of the United States, as more fully hereinafter appears.  This action seeks redress for violations of, and seeking redress under, federal law, including but not limited to the Equal Protection Clause of the Fourteenth Amendment to United States Constitution, 42 U.S.C. § 1983 and 42 U.S.C. § 1988; 20 U.S.C. § 1681-1688 (Title IX of the Education Amendments of 1972).  All discriminatory conduct as alleged herein occurred in a public school setting.

## II.       JURISDICTION AND VENUE

2.       Jurisdiction is conferred upon this Honorable Court pursuant to 28 U.S.C. § 1331 and is founded upon the deprivation, under color of State law, of plaintiff's rights, privileges and immunities guaranteed by the Constitution of the United States, and more particularly under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983; 42 U.S.C. § 1988; and 20 U.S.C. § 1681-1688 (Title IX of the Education Amendments of 1972).

3.       The Court has supplemental jurisdiction over the state-based claims below under 28 U.S.C. § 1367(a) as these claims arise out of the same transactions and occurrences.

4.       Plaintiff is a resident of Adams County, Colorado.

5.       Adams County is a county located in Colorado.  C.R.S. § 30-5-102.

6.      The District is likewise located in Colorado and educates Colorado students in Adams County.  The District is a resident of Adams County, Colorado.  Colo. Const. Art. 9, § 2.

7.      The Board controls instruction at District schools, as it pertains to matters relevant to this Complaint.  *See* Colo. Const. Art. IX, § 15 ("control of instruction in the public schools of their respective districts").  Pursuant to article IX, section 1(1), the constitutional framers contemplated general supervision to include direction, inspection, and critical evaluation of Colorado's public education system from a statewide perspective, intended the State Board to serve as both a conduit of and a source for educational information and policy, and they intended the General Assembly to have broad but not unlimited authority to delegate to the State Board powers consistent with this intent.  *Bd. of Educ. of Sch. Dist. No. 1 in City & Cnty. of Denver v. Booth*, 984 P.2d 639, 648 (Colo. 1999).

8.      The remaining individual defendants are residents of Colorado, and all of them were District employees at the time of the alleged wrongdoings herein.

9.      The wrongful acts alleged by Plaintiff occurred in whole or in part in Adams County, Colorado.

10.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2).

## III.      FACTUAL ALLEGATIONS

11.      On November 19, 2014, Ms. Pamela Boaz ("Ms. Pamela Boaz"), the Plaintiff's mother, contacted Ms. Pamela Smiley ("Ms. Smiley"), the Horizon High School ("Horizon" or "HHS") principal at the time, via email to inform Ms. Smiley that Mr. Eric England ("Mr. England"), one of Ms. Boaz's teachers, had mimicked sex on his desk in class while reviewing the literary story *Romeo and Juliet*.  Ms. Boaz also shared with Ms. Smiley that a male student told

Ms. Boaz, "All Mr. England talks about is books and sex." Ms. Boaz found Mr. England's conduct of mimicking sex to be deeply offensive, and this was expressed through Ms. Pamela Boaz because Ms. Boaz was only a freshman in high school at the time.

12.     By no later than November 19, 2014, Ms. Smiley, the District, the Board and other District representatives were placed on notice of Mr. England's inappropriate conduct. There is no evidence that Ms. Smiley or the District took any action against Mr. England, that they investigated him or that they started a Title IX investigation. Ms. Smiley, the District and the Board were all deliberately indifferent to Mr. England's conduct, to its gender-discriminatory character and to how it was affecting Ms. Boaz and other female students.

13.     During the 2014-2015 school year, Ms. Boaz stayed after class to ask Mr. England a question. Mr. England asked Ms. Boaz if she minded him telling her about the first time he made out with someone. He described how the girl he was kissing slid her tongue into his mouth, that it was a new experience for him, and that he thoroughly enjoyed it. He emphasized how much he liked it.

14.     During this school year, Mr. England would place his hands on Ms. Boaz's back and shoulders in a way that made her feel very uncomfortable. She occasionally physically shook his hands off of her shoulders to avoid him doing it again. Given that this behavior was an unwanted touching, it was an assault against Ms. Boaz. This behavior by Mr. England would continue for the next several years while Ms. Boaz was at HHS.

15.     On two separate occasions that Ms. Boaz can recall, Mr. England would unbutton his shirt and dramatically expose his shoulders, parts of his chest, and his stomach to his class

while teaching.  Mr. England would do this in response to sex scenes in books and would refer to himself as "sexy."  He also told the class not to let his shoulders distract them.

16.     On September 28, 2015, Mr. England praised Ms. Boaz for being a great student and role model.  On that date, he told Ms. Pamela Boaz that Ms. Boaz was a "role model," and he called her "pleasant, intelligent and inspiring to her peers as well as the adults she encounters."  He further wrote, "I'm very proud of her.  She is really propelling our staff in the right directions.  She is an excellent listener, a free thinker, and someone whom her classmates & friends acknowledge as a source of knowledge and energy.  Everyone who knows her here at HHS would say the same.  I appreciate having her in class because she invariably sets the pace in a positive way for all other around her."

17.     During Ms. Boaz's sophomore year in 2015-16, Mr. England told Ms. Boaz the story of losing his virginity.  This was not done at Jordan's request and was unwanted.  He included that it took place during school, that it was the girl's "first time," and that he was scared of girls until he "did it."  This was a story that Mr. England was telling to students along with Ms. Boaz in the journalism newspaper room.  It made Ms. Boaz deeply uncomfortable as a female about attending Mr. England's classes.

18.     In Ms. Boaz's junior year during 2016-17, Mr. England went on an unusually long spiel during journalism class about leggings on girls, describing how it shows off their "asses" and that he has seen holes in the legging butt area on girls.  This made Ms. Boaz deeply uncomfortable as a female about attending Mr. England's classes.

19.     In Ms. Boaz's junior year, Mr. England told the story to several students in the journalism room of the time that he watched two freshman having sex in a Horizon hallway during

his first year teaching at HHS.  He also talked about teens in cars in the Horizon parking lot, saying he's watched them doing the things they do (referring to sex).  This made Ms. Boaz deeply uncomfortable as a female about attending Mr. England's classes.

20.     During Ms. Boaz's junior year, in journalism, Mr. England informed the classmates who were present that he had watched a video of "Horizon students having sex" that had been presented to him by a former journalism student.  This made Ms. Boaz deeply uncomfortable as a female about attending Mr. England's classes.

21.     At this same time, Mr. England shared a story with his journalism students about his meeting a woman who liked him, but he found her "fake boobs unattractive."  This made Ms. Boaz deeply uncomfortable as a female about attending Mr. England's classes.

22.     In September of 2017, during Ms. Boaz's senior year, the AP English Literature ("AP Literature") class was studying Ernest Hemingway's *Indian Camp*, and Mr. England made very inappropriate comments regarding rape to the class.  Specifically, Mr. England said, "It's a little rough and gruff at first, and then maybe she starts to like it."  This so alarmed Ms. Boaz that she reached out to Mrs. Brady via email.

23.     After this incident, on September 28, 2017, Ms. Boaz contacted Ms. Kim Brady ("Ms. Brady"), the principal at HHS, to voice a concern about Mr. England.  Specifically, Ms. Boaz wrote to Ms. Brady: "A few days ago in English Mr. England made a concerning comment involving rape.  I was initially shocked and angered but didn't think to say anything, but as I think about it more, I feel like I should.  It is possibly an overreaction, but I wouldn't be saying anything if I didn't think I should be.  His comment involved rape being 'rough and gruff at first' and then he followed with 'and maybe she starts to like it.'  The subject of rape began with a story we were

reading, but his comment did not refer to the characters.  His mentality on the issue (i.e. that girls may enjoy rape) scared me, and I thought I would say something, even if I am possibly out of line. Thank you, and I would really appreciate if Mr. England does not know that it was me who brought this to your attention."

24.     Ms. Boaz followed up by meeting with Ms. Brady, and informed Mrs. Brady about the incident where Mr. England had disclosed to Ms. Boaz the story of losing his virginity and Ms. Boaz told her specifically, "That's NOT something I want to hear about!"  Ms. Boaz also reported the incident from 2014 where he mimicked sex acts on a desk.  Mrs. Brady told Ms. Boaz she would give Mr. England a warning to keep his conversations with students appropriate, and then if there was another incident she would do something.

25.     Ms. Brady, as Principal of HHS and in her capacity as an agent of the District, knew by no later than September 28, 2017, that Mr. England's conduct with respect to gender discrimination was an issue.

26.     These were formal complaints made both orally and in writing via email to Ms. Brady pursuant to District Policy 8400(5.1) & (5.4).  No written findings related to an investigation of these concerns was ever provided to Ms. Boaz or her parents, as is required by District Policy 8400(5.5).  This makes is clear that the District was engaged in an active practice and procedure of disregarding its own internal policies.

27.     There is no evidence that Mr. England received any sanction related to this complaint, or if he was in fact "warned" by Ms. Brady.  Ms. Brady did not initiate a Title IX investigation, nor any other investigation of Mr. England.  She also did not place him on

administrative leave.  Ms. Brady acted with deliberate indifference in failing to protect Ms. Boaz, and this was part of a policy, practice or procedure at the District level.

28.     In the fall semester of 2017, Mr. England took a picture of a student's breasts in Journalism class with the journalism camera.  This female student was not wearing a bra this day, and Mr. England stared for some time at the picture he took before deleting it and handing the camera to another student.  Jordan's peer from Journalism indicated that she reported the incident to Ms. Brady and also shared of the sexual jokes/stories.  This peer told Jordan that Mrs. Brady indicated that sexual jokes don't make someone a "creep" and that it is tough to be a woman in a newsroom.  This peer's name is Ms. Kaylei Howitt ("Ms. Howitt").

29.     In the fall semester of 2017, Ms. Boaz was taking an exam in AP Literature along with other students.  During the exam, Mr. England placed a book on Ms. Boaz's desk and whispered into her ear, "If you like sex, you should read this. They really get down and dirty in this one."  He went on to tell Ms. Boaz how explicit the sex scenes were.  Ms. Boaz returned the book to his desk when she turned in her exam.  Ms. Boaz refused to look at the book and didn't therefore know the title.  Ms. Boaz was still waiting for Ms. Brady to take some action against Mr. England, which was not happening.

30.     In the fall semester of 2017, Mr. England played an animated video in class of two steaks having sex.  It had no relation to content in the class curriculum.  In fact, there was no discussion of it whatsoever after it ended, besides confused murmur among the students.

31.     In October 2017, the AP Literature students were reading *A Good Man is Hard to Find.*  Mr. England made the joke to class that: "Or as women tell me, 'A hard man is good to

find!'" Mr. England made this joke a minimum of three separate times, using different versions, beginning with "as my female colleagues tell me…" or "as the women think…"

32.     In the fall semester of 2017, Mr. England drew a picture of breasts on the board in AP Literature, and then 'grabbed and caressed' them with his hands in front of students. After grabbing them, he told the class "just kidding, guys, they're eyes," and erased them.

33.     Also in the fall semester of 2017, Mr. England referred to a student in his AP Literature class as a "stripper." He began by describing what strippers wear, including "black clothes," "leather jackets," and "fishnet stockings." He had perfectly described the outfit that a student in the classroom, Ms. Lily Do ("Ms. Do"), was wearing at the time. The class all turned to look at Ms. Do in response to his comments.

34.     At this point, none of the Defendants had taken any action against Mr. England or initiated a formal investigation of any kind, including a Title IX investigation.

35.     On October 17, Mr. England informed Ms. Boaz that she was doing "splendidly" in both of the classes she was taking with him. Ms. Boaz was concerned about her grade because she had missed some class time due to illness.

36.     However, on November 15, less than one month after Mr. England informed Ms. Boaz how well she was doing in his class and after Ms. Boaz had brought Mr. England's conduct to Ms. Brady, Mr. England wrote to other District officials – Mr. Ralph Garcia ("Mr. Garcia") and Ms. Cassidy Gussman ("Ms. Gussman"), both of whom are disciplinary deans of students at HHS – to complain about Ms. Boaz. At no point prior to Ms. Boaz's complaint about Mr. England to Ms. Romero had Mr. England ever accused Ms. Boaz of any kind of wrongdoing. He proceeded to accuse her, as co-editor of the HHS newspaper, of demonstrating defiance of authority,

insubordination, and deception.  He accused her of lying to him and encouraging others to do the same.  He called her "conniving."  He wrote, "Jordan's lying, deceit, dissent and insubordination are intolerable."  He claimed that Ms. Brady and Ms. Katie Romero ("Ms. Romero"), an HHS Assistant Principal and Mr. England's sister, "are fully aware of this issue and have directed me to report Jordan's deceitful actions and misbehavior to your office.  Please take fully disciplinary measures with these incidents.  She has become toxic to those staff members who respect our school, our Journalism program, their Journalism peers, and myself.  As a class consequence, she is being demoted as co-editor; however, there are much more serious matters to address than her title in class.  This student has become a severe problem to the program and other Journalism students and I hope you can deal with her strictly.  My sincere and respectful Journalism students are absolutely troubled by her poor decision-making and deceitful leadership."

37.     At one point, Mr. England said to Ms. Boaz, "I asked everyone in the class and they all don't like you." He accused her of lying on a regular basis, even when she had proof to support what she was saying.  Mr. England told her she was a bad leader, while he had previously praised her for the leadership skills she exemplified. He called her immature, childish, and told her she's "just not good."  Due to the abuse Ms. Boaz suffered in the journalism class, she was forced to drop the class after she consulted with the school's counselor.  This was a disruption of Ms. Boaz's access to education directly related to the abuse by Mr. England, and it was a painful decision to take since Ms. Boaz had put many hours into the school newspaper and loved journalism.

38.     Based on Mr. England's conduct and the emails he sent regarding Ms. Boaz, it was obvious that Mr. England was engaged in a pattern of deliberate discrimination and retaliation against Ms. Boaz.  He brought the HHS deans, whose role is to discipline students, into the picture,

and he retaliated against Ms. Boaz by demoting her.  This retaliation hurt her academically and denied her academic opportunities.  Additionally, Ms. Boaz had no history of any disciplinary violations at HHS.

39.     At one point, and because of the ongoing behaviors being reported by Ms. Boaz to her parents, Ms. Pamela Boaz advised Ms. Boaz she would step in and discuss these concerns with Mr. England.  Ms. Boaz proceeded to tell her mother that having her intervene would make it worse because Mr. England humiliates and mocks students who "run to their mommies" and inform them of what is occurring at school.  Mr. England would often announce to the class that some student's parents had complained.

40.     On November 28, 2017, Ms. Boaz emailed Mr. England due to concerns about her grade and opportunities to lift her grade.  Previously, this was not a problem with Mr. England.  Specifically, it was Ms. Boaz's understanding that Mr. England's policy that if a student missed one seminar, then the next seminar would replace the grade for the missed seminar.  Ms. Boaz had missed a seminar, tried to make it up but was not allowed to do so by Mr. England – even though he allowed other students to make up the seminar.

41.     On December 18, 2017, Ms. Pamela Boaz contacted Mr. England on behalf of Ms. Boaz, expressing concern about Ms. Boaz's grade and Mr. England's seminar policy, which discriminated against Ms. Boaz by not allowing her to make up a seminar that she had missed and that other similarly situated students were allowed to make up after they had missed it.

42.     On December 19, 2017, Ms. Stacey Neumann ("Ms. Neumann"), an HHS School Counselor, contacted Ms. Pamela Boaz and asked her if the two of them could have a meeting

along with Ms. Brady, Mr. England, and Ms. Boaz "to discuss expectations for second semester of AP English."

43.     Between December 13, 2017 and January 8, 2018, several emails were exchanged regarding the situation with Ms. Neumann.  The emails addressed concerns that Mr. England was targeting Ms. Boaz.

44.     Ultimately, Ms. Boaz ended up receiving a "C" grade in Mr. England's AP Literature class and a "B" in Mr. England's Journalism class during the 2017-18 year.  Throughout middle school, Ms. Boaz was literally a straight "A" student with a perfect GPA.  In all previous English and Journalism courses at HHS, including with Mr. England, she never received a grade lower than an "A."  Her ACT scores placed her into either the 94th or 97th percentiles.  In short, she had a history of outstanding grades and academic performance.  This continued in general and in Mr. England's classes – until Ms. Boaz reported Mr. England's conduct to Ms. Brady and was actively complaining about it along with her parents.  Mr. England and Ms. Brady were engaged in an active pattern of retaliation against Ms. Boaz.

45.     On January 8, 2018, Ms. Boaz formally requested a grade review for her Advanced Placement English Literature ("AP Literature") and Journalism classes with Mr. England.

46.     On January 9, Ms. Brady assured Ms. Boaz that she would look into issues with Mr. England when Ms. Brady returned from a medical absence.  She further asked Ms. Boaz if she had reached out herself to Mr. England directly to address her concerns.  Ms. Boaz informed her that both she and her mother had reached out to Mr. England in December, to no avail.

47.     On January 16, Ms. Brady informed Mr. England that Ms. Boaz and her mother had filed an official request for a grade review.

48.     On January 18, Ms. Brady asked Mr. Lance Boyd ("Mr. Boyd") if he recalls whether Ms. Boaz came to Mr. England's desk to try to take a quiz on multiple occasions when Mr. England was not there.  Ms. Brady never informed Ms. Boaz of what Mr. Boyd disclosed.

49.     On January 19, Mr. England thanked Ms. Brady for "tolerating his frustration with [the Boaz] situation."

50.     On January 26, Ms. Brady informed Ms. Boaz that she had completed her investigation of Ms. Boaz's grades and that she would leave Mr. England's grades undisturbed, thereby denying relief to Ms. Boaz.

51.     On that same date, Ms. Pamela Boaz asked Ms. Brady to have another teacher observe Mr. England's AP Literature seminar due to concerns regarding Mr. England's conduct toward Ms. Boaz.  Ms. Brady did not take action to make this happen.

52.     On January 29, Ms. Brady informed Mr. England that she confirmed the grades that he gave to Ms. Boaz and would not change them.

53.     On January 31, Ms. Boaz went to Mr. England's class for intervention to make up an assignment she had missed the day before on an excused absence.  Ms. Boaz called her mother after this intervention, sobbing so hard that the conversation revolved around her calming down and regaining control.  The Boazes' younger daughter had seen Ms. Boaz in the hallway crying and inquired with her parents about what was happening.  Later that evening, Ms. Boaz indicated that Mr. England was once again making it impossible for her to make up an assignment, talking in circles, not answering direct questions and refusing to give her the work.  Ms. Boaz sent him an email to clarify what was expected of her.

54.     On February 7, Ms. Boaz once again went to Mr. England's class for intervention. He once again harassed her to the point where she had to walk out of the classroom, leaving her backpack and belongings behind. She called her mother stating that she was having a panic attack following Mr. England's treatment of her. Ms. Boaz was hyperventilating and crying so hard on the phone that her mother could hardly understand her. Ms. Pamela Boaz worked to calm Ms. Boaz down and asked her to get to class. Later that evening, Ms. Boaz informed Ms. Pamela Boaz that a paraprofessional named Ms. Kathy Carlow ("Ms. Carlow") found her on the floor of a bathroom stall crying about 30 minutes later. She checked in on her and then returned to take her to the counselor's office. Ms. Neumann, the counselor, met with Ms. Boaz after this incident. Ms. Neumann expressed extreme frustration at Mr. England's continued behavior and problem-solved the situation with Jordan. Later that day, Ms. Aneyah Wood ("Ms. Wood"), who had witnessed Mr. England's treatment of Ms. Boaz at intervention that morning, texted Ms. Boaz saying, "Mr. England was being stubborn and reluctant to let you make up the peer revision assignment. I thought that the way he was talking to you was rude and that I know everything you said wasn't wrong (despite him claiming it to be) I cannot apologize for his behavior, but he was rude and no one deserves to be spoken to like that." Ms. Pamela Boaz followed up with both Ms. Carlow and Ms. Neumann.

55.     The following day, on February 8, another teacher, Mr. Ed Taylor ("Mr. Taylor"), noticed that Ms. Boaz wasn't herself in his class. Ms. Boaz disclosed to Mr. Taylor some of the bullying behavior she was experiencing with Mr. England. (Ms. Boaz did not discuss any of the sexually related harassment she had suffered to Mr. Taylor because it was embarrassing). Mr. Taylor told her that they have been hearing these stories of Mr. England's harassing behaviors for

years, noting that "it always seems to be a high-achieving female student."  As Ms. Boaz was leaving class, Mr. Taylor told her she could start her own #MeToo movement.  Mr. Taylor proceeded to tell her a former student's name and told her this student also described the same behavior by Mr. England that Ms. Boaz is experiencing.  Like Ms. Boaz, this former student was also the editor of the newspaper.

56.     Ms. Boaz and her parents have spoken with this student's family and have confirmed that they had addressed Mr. England's bullying of their daughter five years ago in an administrative meeting in which Ms. Brady was present.  Therefore, the Defendants, in whole or in part, have been on notice of Mr. England's conduct, have behaved with deliberate indifference to it and how it was affecting Ms. Boaz, and such conduct by the Defendants was part of a policy, pattern or procedure.

57.     On February 12, Ms. Pamela Boaz filed a police report with the Thornton Police Department due to Mr. England inappropriate and assaultive behavior against Ms. Boaz.

58.     On February 13, Ms. Boaz had arrived in her AP Literature class and was approaching her desk.  Ms. Boaz was forcefully "shoulder checked" from behind, which caused her to lose her balance.  This rough physical contact had come from Mr. England pushing past her as he entered the classroom.  This was not a brush of her shoulder as he passed, but a hit directly on her shoulder blade.  He did not apologize, continued on his way, mumbling "oh, excuse me."  This was part of Mr. England's retaliation against Ms. Boaz.

59.     On February 13, Ms. Brady asked to meet with Mr. England.

60.     On February 14, Mr. England thanked Ms. Brady for her insight and told her that he would meet with the District Twelve Educators' Association ("DTEA"), which is the local teachers' union, and "at the very least establish a cease and desist."

61.     On February 23, Ms. Cindy Douma ("Ms. Douma"), a District administrative assistant, asked Ms. Brady to send her any evaluations, counseling sessions or otherwise regarding Mr. England.  That day, Ms. Brady informed Ms. Doumas that "there are no counseling sessions and or documents related to any progressive disciplinary action" regarding Mr. England.

62.     During the spring 2018 semester, instead of removing Mr. England from Ms. Boaz and other students, the District moved Ms. Boaz to another school so she could access her AP Literature class there.  This was a denial of access to education to Ms. Boaz based on her complaints about Mr. England and based on the retaliation of various Defendants.

63.     On March 1, Ms. Boaz's parents were forced to agree to move Ms. Boaz to another school to receive her AP Literature instruction – away from Mr. England.  They stated that they "accepted an offered accommodation of (Ms. Boaz) attending another high school for her AP Literature class because it was the lesser of bad options – the other being remaining in the class with her harasser for an indeterminate amount of time."  The preferred option was to have Mr. England placed on administrative leave, but that did not happen at this point.

64.     Also on March 1, Mr. Lee Peters ("Mr. Peters"), at that time the executive director of schools for the District, informed Mr. England that the District had received a complaint by a student (Ms. Boaz) based on District Superintendent Policy #8400 – nondiscrimination.  Mr. Peters asked to set up a meeting with Mr. England.  Mr. England informed Mr. Peters that he would meet

with him on March 5 and would bring Mr. Dave Lockley ("Mr. Lockley"), a representative of the DTEA.

65.     On March 14, Mr. Peters informed Ms. Brady and Mr. England that there was an ongoing investigation and that they were not to speak to other staff or students during that investigation.  However, neither Ms. Brady nor Mr. England were placed on administrative leave, which would have ensured that they could not taint the investigation.

66.     On March 20, Ms. Boaz – who had zero previous formal disciplinary history at HHS and who had never been truant – was given an attendance/truancy infraction.  This was part of a deliberate retaliatory practice against Ms. Boaz.

67.     On March 21, Mr. Peters informed Ms. Brady that he wanted to interview Mr. Matt Fiorenza ("Mr. Fiorenza") and Ms. Tina Walters ("Ms. Walters"), two of Mr. England's recent teaching partners.  Mr. Peters also wanted to speak to three or four journalism students from Mr. England's previous classes.  Mr. Peters met with Mr. Fiorenza and Ms. Walters on March 22.

68.     Also on March 21, the U.S. Office for Civil Rights ("OCR") received a complaint filed on behalf of Ms. Boaz in which it was alleged that the District had discriminated against Ms. Boaz based on her gender.  OCR opened an investigation.  At that point, Mr. England still had not been placed on Administrative Leave and no Title IX investigation had been initiated by any of the Defendants.

69.     On April 12, Mr. England removed Ms. Boaz from the class roster.

70.     On April 16, District officials interviewed Ms. Boaz.

71.     On April 18, Ms. Kristy Riccio ("Ms. Riccio"), informed Ms. Brady and Mr. England that Mr. England was being placed on administrative leave.

72.     On August 30, 2018, the District completed its own investigation.  It denied many of Ms. Boaz's claims, but it did find several as founded:

> a.  "Mr. England failed to respect interpersonal boundaries with male and female students including [Ms. Boaz], by invading their personal space (for example, by stretching his arm across their shoulders);"
>
> b.  "Mr. England engaged in personal conversations with students unrelated to District curriculum;"
>
> c.  "Mr. England drew an inappropriate picture on the board in the presence of his AP Literature class;"
>
> d.  "Mr. England engaged in unprofessional discussion and commentary, including commentary about 'fishnet stockings' and 'what people wear on Colfax Avenue,' and that his commentary was specifically directed at the attire of a student who was wearing fishnet stockings that day;" and
>
> e.  "Mr. England was rude and unprofessional towards [Ms. Boaz] on February 7, 2018."

73.     The District has an extensive history of Title IX violations, indicating a pattern, practice, policy or procedure by the Defendants of engaging in Title IX violations.  On December 1, 2017, the District, through Mr. Gdowski, its superintendent, entered into a Resolution Agreement with the U.S. Office for Civil Rights after the OCR found numerous violations by the District pertaining to Title IX.  This was in OCR Case Number 08-17-1353.

74.     The District also reached a Resolution Agreements with OCR in other civil rights cases in the past six years: Case Number 08-14-1205 and Case Number 08-13-1293.

75.     On April 3, 2018, a local Denver news channel, 9NEWS, featured a news story about Stargate Charter School, which is within some level of control by the District.  The headline was: "Civil rights complaints piling up against respected Thornton charter school."  The article indicated that "seven complaints were filed in the last two years with the Office of Civil Rights…"  A recent news article in Denver newspaper Westword was headlined: "Thornton Charter School Faces Sexual Harassment, Discrimination Complaints."

## IV.     LEGAL OVERVIEW

76.     Section 1 of the Fourteenth Amendment to the United States Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."

77.     Consistent therewith, on June 23, 1972 the U.S. President signed the Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX").  Pub. L. 92-318, Title IX, § 901.  In pertinent part, Title IX provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  20 U.S.C. § 1681(a).  Title IX expressly contemplates within its nondiscrimination mandate "any public or private preschool, elementary, or secondary school . . . ."  *Id.* at (c).

78.     A state is not immune under the Eleventh Amendment to the United States Constitution from suit in Federal court for a violation of Title IX.  42 U.S.C. § 2000d-7.

79.     Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract, is authorized to effectuate Title IX by way of rules, regulations, or orders.  20 U.S.C. § 1682.

80.     The Office for Civil Rights, United States Department of Education regulations adopted pursuant to sections 1681 and 1682 at issue in this action are embodied in Chapter I of Subtitle B of Title 34 of the Code of Federal Regulations.  Specifically, 34 C.F.R. § 106.31(b) prohibits recipients of Federal funds from:

> (1)     Treat[ing] one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service;
> (2)     Provid[ing] different aid, benefits, or services or provide aid, benefits, or services in a different manner;
> (3)     Deny[ing] any person any such aid, benefit, or service;
> (4)     Subject[ing] any person to separate or different rules of behavior, sanctions, or other treatment;
> (5)     Apply[ing] any rule concerning the domicile or residence of a student or applicant, including eligibility for in-state fees and tuition;
> (6)     Aid[ing] or perpetuat[ing] discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees;
> (7)     Otherwise limit[ing] any person in the enjoyment of any right, privilege, advantage, or opportunity.

81.     Each recipient of Federal funds must designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX.  34 C.F.R. § 106.8(a). This obligation includes any investigation of any complaint communicated to such recipient alleging its noncompliance with Title IX.  *Id.*  Each recipient must notify all its students of the name, office address, and telephone number of the responsible employee.  *Id.*  Further, recipients must adopt and publish grievance procedures providing for prompt and equitable resolution of student complaints alleging any action prohibited by Title IX.  *Id.* at (b).

82.     Whether or not a student files a complaint of alleged sexual misconduct or otherwise asks a school to take action, where a school knows or reasonably should know of an incident of sexual misconduct it must take steps to understand what occurred and to respond

appropriately.  U.S. Dept. of Educ., O.C.R., Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, p. 12 (Jan. 2001) (herein "2001 Guidance"), *available at https://tinyurl.com/yaeajxkz*.  In particular, when sexual misconduct is so severe, persistent, or pervasive as to deny or limit a student's ability to participate in or benefit from the school's programs or activities, then a hostile environment exists, and the school must respond.  *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 631 (1999); 34 C.F.R. § 106.31(a).

83.     Schools are required by the Title IX regulations to adopt and publish a policy against sex discrimination and grievance procedures providing for the prompt and equitable resolution of complaints of discrimination on the basis of sex. 2001 Guidance, p. 19.  Accordingly, regardless of whether harassment occurred, a school violates this requirement of the Title IX regulations if it does not have those procedures and policy in place.  *Id.*

84.     "[W]hen sexual misconduct is so severe, persistent, or pervasive as to deny or limit a student's ability to participate in or benefit from the school's programs or activities, a hostile environment exists and the school must respond."  *Q&A on Campus Sexual Misconduct*, U.S. Dept. of Educ., Office for Civil Rights, Sept. 2017, p.1.  "OCR considers a variety of related factors to determine if a hostile environment has been created . . . .  OCR considers the conduct from both a subjective and objective perspective.  In evaluating the severity and pervasiveness of the conduct, OCR considers all relevant circumstances[.]"  *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, U.S. Dept. of Educ., Office for Civ. Rights, Jan. 2001, p. 5.

85.     Title IX regulations do not prescribe particular procedures which a school must put in place, but whatever nondiscrimination policy the school effects must provide effective means

for preventing and responding to sexual harassment. *Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 631 (1999); 34 C.F.R. § 106.31(a).* The OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the procedures provide for:

- Notice to students, parents of elementary and secondary students, and employees of the procedure, including where complaints may be filed;
- Application of the procedure to complaints alleging harassment carried out by employees, other students, or third parties;
- Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence;
- Designated and reasonably prompt timeframes for the major stages of the complaint process;
- Notice to the parties of the outcome of the complaint; and
- An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.

2001 Guidance, p. 20.

86.    In regulating the conduct of students and faculty to prevent or redress discrimination, schools must formulate, interpret, and apply their rules in a manner that respects the legal rights of students and faculty so as to protect academic freedom. 2001 Guidance, p. 22.

87.    Although there is no specified timeframe under which a school must complete an action, an investigation must be completed within a reasonably prompt timeframe designated by an institution's policy, conducted in a manner that is consistent with the institution's policies and transparent to the accuser and accused with timely notice of meetings and equal access to information to be used during informal and formal disciplinary meetings and hearings. 34 C.F.R. § 668.46(k)(3)(i); 2001 Guidance, ps. 19-21.

88.    An "equitable investigation" includes the following:

In every investigation conducted under the school's grievance procedures, the burden is on the school—not on the parties—to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred and, if so, whether a hostile environment has been created that must be redressed. A person free of actual or reasonably perceived conflicts of interest and biases for or against any party must lead the investigation on behalf of the school. Schools should ensure that institutional interests do not interfere with the impartiality of the investigation.

An equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence—including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case. Any rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms. Restricting the ability of either party to discuss the investigation (e.g., through "gag orders") is likely to deprive the parties of the ability to obtain and present evidence or otherwise to defend their interests and therefore is likely inequitable. Training materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially.

Once it decides to open an investigation that may lead to disciplinary action against the responding party, a school should provide written notice to the responding party of the allegations constituting a potential violation of the school's sexual misconduct policy, including sufficient details and with sufficient time to prepare a response before any initial interview. Sufficient details include the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident. Each party should receive written notice in advance of any interview or hearing with sufficient time to prepare for meaningful participation. The investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence. The reporting and responding parties and appropriate officials must have timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearings.

U.S. Dept. of Educ., O.C.R., Q&A on Campus Sexual Misconduct, p. 4 (Sept. 2017) (herein "2001 Guidance"), *available at https://tinyurl.com/y99osa9m* (citations omitted).

## V.    CLAIMS AND CAUSES OF ACTION

**A.    COUNT ONE: 20 U.S.C. § 1681(a) *et seq*. – Deliberate Indifference to Sexual Harassment in Violation of Title IX of the Education Amendments of 1972 – Against Adams 12 Five Star Schools**

89.    Plaintiff realleges all other paragraphs as if fully set forth herein.

90.    A plaintiff must allege four factors to state a claim of school district liability under Title IX.  She must allege that the district (1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive, and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school. *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1246 (10th Cir. 1999) (*citing Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 638 (1999).

91.    Title IX reaches institutions and programs that receive federal funds, 20 U.S.C. § 1681(a), which may include nonpublic institutions, *id.* at (c), but it has been consistently been interpreted as not authorizing suit against school officials, teachers, and other wrongdoers, *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009).

92.    Plaintiff was a District student.  As a female, she is a member of a suspect class that has been historically an object of invidious discrimination.

93.    The District, and the individual defendants, at all times relevant to this Complaint acted under color of state law.  The District is a subdivision of Adams County, Colorado.

94.    Since no later than November 19, 2014, the District had actual knowledge of, and have been deliberately indifferent to, repeated reports of a sexual harassment and assault (via unwanted touching) against Plaintiff, then subsequent retaliation against Plaintiff as more fully described above.

95.     However, the District has had actual notice of Mr. England's conduct much longer as it pertains to what he has done with or to other female students prior to what he did to Plaintiff.

96.     As a direct and proximate result of Defendants' deliberate indifference, Plaintiff was subjected to repeated bullying, ridicule, retaliation, and harassment at HHS, as more fully described above.  The acts of bullying, harassment and retaliation were severe, pervasive, and objectively offensive.

97.     These acts resulted in Plaintiff's suffering further significant, severe, and ongoing emotional distress and mental anguish.

98.     Defendants' failure to take any action to stop the severe and pervasive bullying, ridicule, retaliation, and harassment at HHS, despite their authority and obligation to do so, was clearly unreasonable in light of known circumstances.

99.     During all times relevant to the allegations herein, the District had a pattern and practice of Title IX non-compliance, as further explained above.  Highlights include, by way of example and not limitation, other OCR cases and resolution agreements, and other widely-circulated news stories about Title IX violations and the District's schools.

100.    Despite the increased scrutiny from the OCR and public knowledge of the Title IX violations, the District shirked its Title IX oversight responsibilities.  The District had actual knowledge of the Title IX violations at its schools.  Additionally, the District reasonably should have known of what was happening at its schools and should have undertaken action to adequately train and investigate its employees.  It did not do so under a reasonably prompt timeframe and District-wide Title IX-non-compliance issues persist.

101.    Plaintiff was subjected to gender-based discrimination that was so severe, pervasive, and objectively offensive that she was denied access to educational opportunities and benefits. Plainly, the District elected to shelter a male teacher who repeatedly harassed Plaintiff several other female students, and every female student who was subjected to his hostile, offensive, and sexually suggestive comments in his classroom.

102.    Mr. England happened to be Ms. Romero's brother.  Ms. Romero was charged with assistance in the investigation into him.  Ms. Romero had an obvious conflict of interest, and she should not have been involved with investigating her brother.  The sexual harassment complaints against him ought to have been referred to a neutral third-party.  This was not an equitable investigation.

103.    Plaintiff continues to suffer from considerable anxiety and emotional distress regarding her experience, safety, and well-being.  Also, her collegiate prospects were diminished by a lower GPA that was the result of the District's retaliatory conduct.

104.    Plaintiff's rights to attend classes of her choice and advance in her chosen educational institution have been violated.  The District changed Plaintiff's placement, but it should have removed Mr. England through paid administrative leave pending investigation instead.

105.    Defendants by their separate treatment of similarly or equally situated students on the basis of sex have engaged in unlawful and invidious discrimination.

106.    Plaintiff has suffered damages as a result of Defendants' deliberate indifference.

107.    Defendants' rules, regulations, policy, practice, or procedures have no reasonable relationship to the District's stated educational goals or policies, no practical application to the

performance and education of students, and is not necessary to the orderly and efficient instruction process.

**B.     COUNT TWO: 20 U.S.C. § 1681(a) *et seq*. – Retaliation in Violation of Title IX of the Education Amendments of 1972 – Against Adams 12 Five Star Schools**

108.    Plaintiff realleges all other paragraphs as if fully set forth herein.

109.    20 U.S.C. § 1681(a) provides that: No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . .

110.    In September of 2017, Plaintiff attempted to discuss Mr. England's alleged misconduct with Ms. Brady via email and in person shortly thereafter.

111.    Plaintiff's approaching Defendant Brady, who is a school principal, is a protected activity within Title IX.

112.    Shortly after bringing her concerns regarding Mr. England to Ms. Brady, Plaintiff was subjected to increasingly severe, retaliatory, and outrageous conduct by Mr. England.

113.    As the Fall 2017 semester progressed, Mr. England's inappropriate conduct toward Plaintiff reached a point that Plaintiff felt she had no choice but to drop her Journalism class, which had previously been one of her passions.

114.    Around the same time, Plaintiff's grades in classes taught by Mr. England began to inexplicably drop with no apparent connection to the quality of her coursework.

115.    During the Spring 2018 semester Mr. England's misconduct again increased in severity, reaching the point where his abusive behavior would cause Plaintiff to have panic attacks requiring her to spend extended periods of time in the school bathroom trying to compose herself.

116.    During one such panic attack, Plaintiff was discovered in a distraught state by Ms. Kathy Carlow, a school employee, who helped Plaintiff calm down and took her to speak to Ms. Stacey Neumann, a school counselor, to better remedy the situation.

117.    Mr. England's retaliatory acts culminated on or about February 13, 2018, when he forcefully shoulder checked Plaintiff from behind in full view of Plaintiff's classmates.

118.    Shortly after this incident, Plaintiff was removed from Mr. England's Advanced Placement Literature class and placed in a similar class at Legacy High School, which is in Broomfield, Colorado and located approximately five miles from Horizon High School.  This partially kept Ms. Boaz from HHS, the only high school she had attended previously, and it kept her away from her friends and familiar instruction.

119.    This purported accommodation by the District created an undue and unnecessary hardship for Plaintiff while allowing Mr. England to maintain his position with no adverse action despite both HHS and District administrators having actual notice of his misconduct.  The District later admitted after investigation Mr. England's conduct was improper.

120.    The District received actual notice of the retaliatory conduct described in this Complaint on or about March 21, 2018.  It did not promptly or equitably investigate and resolve the Title IX issues identified.  Indeed, it did not complete the investigation until the end of the following summer, long after issues germane to the OCR Complaint came and went.  Five months is too long.

121.    The preceding allegations were directly and proximately caused by the District and Ms. Brady and Mr. England retaliating against Plaintiff for complaining about Mr. England's

misconduct as evidenced by the substantial increase in frequency and severity of inappropriate behavior following Plaintiff's initial complaint to Ms. Brady.

122.    This retaliation by Defendants constitutes a *per se* intentional violation of Title IX under clearly established Supreme Court precedent.

123.    Defendant Adams 12 Five Star Schools is not entitled to immunity as the receipt of federal funding under Title IX is conditioned on a clear, unambiguous, and unequivocal waiver thereof.  Such waiver does not exist.

124.    Because Defendants' retaliation is an intentional violation of Title IX, Plaintiff is entitled to monetary damages.

125.    Plaintiff is also entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b), pre-judgment interest, and costs as allowable by federal law.

**C.    COUNT THREE: 42 U.S.C. § 1983 – Sex Discrimination in Violation of the Due Process and Equal Protection Clauses – against Mr. England**

126.    Plaintiff realleges all other paragraphs as if fully set forth herein.

127.    42 U.S.C. § 1983 provides that: "Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . . ."

128.    Plaintiff is a citizen of the United States and Mr. England is a person for the purposes of 42 U.S.C. § 1983.

129.   At all relevant times Mr. England was acting under the color of state law in his capacity as a teacher at a public school.

130.   As the alleged conduct occurred during school hours and, on many occasions, while Plaintiff was attending classes taught by Mr. England, his acts were conducted within the scope of his employment.

131.   The Equal Protection Clause requires states to treat an individual in the same manner as others in similar conditions and circumstances.

132.   Plaintiff has a clearly recognized, protected interest in her right to an education free from sex-based discrimination.

133.   Mr. England's inappropriate conduct of a sexual nature was of such severity that it created a hostile classroom environment, and Ms. Smiley's and Ms. Brady's failure to investigate and discipline Mr. England contributed to this environment.

134.   The hostile environment created by Mr. England forced Plaintiff to withdraw from a Journalism class taught by Mr. England and had other adverse effects on Plaintiff's academic performance, thereby depriving Plaintiff of her protected interest in a right to an education free of sex-based discrimination and caused her other damages.

135.   Additionally, Mr. England violated Plaintiff's right to be free from bodily intrusion by his frequent placement of his hands on Plaintiff's shoulders, as well as when he shoulder-checked Plaintiff in retaliation to her report of him to his superiors.

136.   Mr. England is not entitled to qualified immunity for his discriminatory acts.

137.    As a direct and proximate result of Mr. England's conduct, Plaintiff was deprived of her constitutional rights and suffered other damages, including severe emotional distress entitling her to compensatory and special damages, in amounts to be determined at trial.

138.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1983, pre-judgment interest, and costs as allowable by federal law.

139.    Plaintiff is also entitled to punitive damages against Mr. England pursuant to 42 U.S.C. § 1983, as Mr. England acted maliciously, willfully, or with a reckless and wanton disregard for Plaintiff's constitutional rights.

**D.    COUNTS FOUR AND FIVE: 42 U.S.C § 1983 – Deliberate Indifference to Sex Discrimination in Violation of the Equal Protection Clause of the Fourteenth Amendment – Against Ms. Brady and Ms. Smiley**

140.    Plaintiff realleges all other paragraphs as if fully set forth herein.

141.    42 U.S.C. § 1983 provides that:  Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress.

142.    The Equal Protection Clause requires the government to treat an individual in the same manner as others in similar conditions and circumstances regardless of gender.

143.    Plaintiff is a citizen of the United States and Ms. Brady and Ms. Smiley are persons for the purposes of 42 U.S.C. § 1983.

144.    At all relevant times Ms. Brady and Ms. Smiley were acting under the color of state law in their capacity as principals at a public school.

145.    As Ms. Brady and Ms. Smiley's position affords them supervisory and disciplinary authority over teachers, their acts and omissions were conducted within the scope of their employment.

146.    Plaintiff has a clearly established, recognized protected right to an education free from sex-based discrimination.

147.    Plaintiff's mother informed Ms. Smiley of Mr. England's conduct, and she failed to act appropriately to address it.  She failed to act despite Title IX requiring action.

148.    Plaintiff attempted to speak to Ms. Brady about Mr. England's conduct on multiple occasions.  Likewise, she failed to address it despite Title IX obligations.

149.    Ms. Smiley and Ms. Brady were the appropriate persons for Plaintiff to approach with these concerns pursuant to District Policy 4110 (8.1).

150.    Ms. Smiley's inaction led to Mr. England's conduct against Ms. Boaz to continue, unchecked, for an extended period.  Ms. Smiley's inaction was part of a pattern of deliberate indifference.

151.    During meetings Ms. Brady would act uninterested and trivialize these allegations, dismissing concerns raised by Plaintiff and other students with statements such as "jokes do not make someone a creep" and normalizing Mr. England's conduct by attributing complaints to the difficulties of being a woman in the newsroom.

152.    Ms. Brady's dismissal of and attempts to avoid hearing Plaintiff's allegations against Mr. England indicate a deliberate indifference to being alerted to possible sexual misconduct by one of her subordinates.

153.    In addition to her failure to take appropriate action within her capacity as a school principal, Ms. Brady failed to report these allegations against Mr. England to the District's Chief Human Resources Officer in violation of District Policy 5540 (4.0).  Ms. Smiley similarly failed to properly report.

154.    This deliberate indifference and failure to report by Ms. Smiley and Mrs. Brady allowed a hostile classroom environment to flourish as Mr. England's inappropriate and sexualized conduct continued and increased in violation of Title IX.

155.    The hostile environment was facilitated by Ms. Brady and Ms. Smiley's deliberate indifference to serious misconduct, and it deprived Plaintiff of her recognized interest in her right to an education free from sex-based discrimination causing her other damages.

156.    Ms. Brady and Ms. Smiley are not entitled to qualified immunity for their alleged acts and omissions as Plaintiff's rights are clearly established under statutes and regulations enacted under the aegis of the Equal Protection Clause.

157.    As a direct and proximate result of Ms. Smiley and Ms. Brady's conduct, Plaintiff was deprived of her constitutional rights and she suffered other damages, including severe emotional distress, entitling her to compensatory and special damages in amounts to be determined at trial.

158.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1983, pre-judgment interest, and costs as allowable by federal law.

159.    Plaintiff is also entitled to punitive damages against Ms. Brady and Ms. Smiley pursuant to 42 U.S.C. § 1983 as Defendants Brady and Smiley acted maliciously, willfully, or with a reckless and wanton disregard for Plaintiff's constitutional rights.

**E.    COUNTS SIX THOUGH TWELVE: 28 U.S.C. § 1983 Claim – Against All Defendants Except Mr. England (see above)**

160.    Plaintiff realleges all other paragraphs as if fully set forth herein.

161.    This Complaint alleges the deprivation of rights afforded under the Fourteenth Amendment to the United States Constitution, and Title IX, rights clearly established, as more fully described in *Murrell v. Sch. Dist. No. 1, Denver, Colorado*, 186 F.3d 1238, 1250-52 (10th Cir. 1999) (discussing qualified immunity), rights about which the District and its agents and employees were acutely aware.

162.    A local board's resolution of individual cases inherently implicates its ability to control instruction. *Bd. of Educ. of Sch. Dist. No. 1 in City & Cnty. of Denver v. Booth*, 987 P.2d 639, 649 (Colo. 1999).   As a corollary, generally applicable law triggers control of instruction concerns when applied to specific local board decisions likely to implicate important educational policy. *Id.*  Local board discretion can be restricted or limited in such circumstances by statutory criteria and/or judicial review. *Id.*

163.    As noted above, the District has a widespread custom, policy, or practice of sex-based discrimination.  It has not properly implemented Title IX, despite numerous prior violations.

164.    District has, at least on paper, a Title IX policy likely meeting Title IX muster.  That written policy is not followed; rather, violating Title IX is the informal custom amounting to a widespread practice that is so well-settled as to constitute a custom or usage with the force of law.

Indeed, the District's custom was widespread—evidenced by failures to conform its policies in practice to Title IX at its schools and, more particularly, at HHS.

165.    In botching its obligations under Title IX, the conduct by the Entity Defendants and Individual Defendants, other than Mr. England, was the moving force behind Plaintiff suffering her constitutional deprivations.

166.    The District Board of Education is the policymaking body for the District.  The District and its Board of Education had actual knowledge of the District's system-wide Title IX violations by and through their receipt of various OCR complaints concerning Title IX violations but failed to put in place processes and procedures to ensure compliance therewith, in practice, in violation of Title IX and it likewise failed to supervise the District's compliance.

167.    Mr. Gdowski, Ms. Brady, Ms. Romero and Ms. Smiley implemented the District's informal policy of Title IX violations in practice.  Mr. Gdowski was a final policymaker for the District as it relates to implementing district-wide Title IX processes and procedures as superintendent.  Ms. Brady, Ms. Smiley, and Ms. Romero were final policymakers for the District as it relates to implementing Title IX processes and procedures in practice at HHS.  The Board delegated its Title IX implementation from itself to Mr. Gdowski, and, in turn, to Ms. Brady and Ms. Romero.

168.    The Board was aware of Mr. Gdowski, Ms. Brady, and Ms. Romero's conduct, as such, their conduct may fairly be attributable to the Board.

169.    The Board failed to adequately train and supervise Mr. Gdowski, Ms. Brady, and Ms. Romero regarding the District's Title IX obligations.  Title IX issues in schools are a commonplace or usually occurring circumstance with which a school must deal.  Hence, the

Board's failure to adequately train subordinates demonstrates a deliberate indifference on the part of the Board toward prompt and equitable treatment and investigations concerning the students with whom faculty interact, as more fully described above.

170.    The Title IX breaches illuminated above caused Plaintiff's suffering and damages. The Entity Defendants and Individual Defendants, excepting Mr. England, had actual knowledge of Mr. England's sexually hostile conduct on previous occasions but did nothing about his conduct. Hence, they tacitly condoned his conduct.

171.    The District, its Board of Education, Mr. Gdowski, Ms. Smiley, Ms. Romero and Ms. Brady failed to adequately train or supervise employees, particularly Mr. England.  These defendants had actual knowledge of District written policy, State law, and Title IX obligations, but they deliberately failed to follow these policies and law, as was their informal custom.  Their failures caused Plaintiff injury.

172.    The District's informal policy was closely related to Plaintiff's federally protected right under Title IX.  In other words, the District's policy was the moving force behind the injury to Plaintiff's constitutionally protected rights under Title IX.

**F.      COUNT THIRTEEN: Common-law Battery – Against Mr. England**

173.    Plaintiff realleges all other paragraphs as if fully set forth herein.

174.    Mr. England's shoulder-check and placement of his hands on Plaintiff's shoulders, as more fully described above, resulted in physical contact with Plaintiff.

175.    Mr. England intended to make harmful or offensive physical contact with Plaintiff on these occasions.

176.    These contacts were indeed harmful or offensive.

177.    The contact caused Plaintiff to suffer damages, including but not limited to physical and mental pain and suffering, inconvenience, emotional stress, fear, anxiety, embarrassment, humiliation, impairment of the quality of life, in an amount to be proven at trial.

G.    **COURT FOURTEEN: Common-law Intentional Infliction of Emotional Distress – Against Mr. England**

178.    Plaintiff realleges all other paragraphs as if fully set forth herein.

179.    Mr. England engaged in extreme and outrageous conduct, as more fully described above.  His conduct at school and what he did to Plaintiff, a young, female student, in engaging in a prolonged pattern of ridiculing and berating her in an overly-sexualized manner, was so extreme in degree that a reasonable member of the community would regard such conduct as atrocious, going beyond all possible bounds of decency and utterly intolerable in a civilized community.

180.    Mr. England undertook his campaign of retribution specifically intending to retaliate for Plaintiff's report his inappropriate, overly-sexualized behavior.  He undertook these actions knowing that severe emotional distress would result from his chosen course of action, or at a minimum he reasonably should have known his conduct was certain or substantially certain to result in emotional distress, given his actual knowledge of Plaintiff.

181.    As a result of Mr. England's conduct, Plaintiff suffered severe emotional distress, so much so that Plaintiff broke down in tears immediately after a particularly egregious outburst, and HHS personnel undertook immediate action to attempt to make her feel better.  This HHS employee agreed this singular incident was, at a minimum, inappropriate.  Eventually, as the abuse mounted, Plaintiff began to suffer panic attacks over the course of a prolonged period.

182.    Prior to and during Mr. England's campaign, he had knowledge of Plaintiff's particular susceptibilities to emotional distress by reason of her youth.  Mr. England was in a position of power as Plaintiff's teacher, in control of her grades and her future collegiate prospects—moreover her future.  He publicly harassed her, in front of other students.  He knew the overly-sexualized content of his comments troubled her.  Yet, with that knowledge, he deliberately chose to continue his overly-sexualized barrage.

183.    Mr. England was not exercising legal rights afforded to him as a teacher; rather, Title IX prohibits what he did.

### H.    COUNT FOURTEEN THROUGH TWENTY-ONE: Discrimination in Place of Public Accommodation under C.R.S. § 24-34-601 – Against All Defendants

184.    Plaintiff realleges all other paragraphs as if fully set forth herein.

185.    Pursuant to the Colorado Anti-discrimination Act, C.R.S. § 24-34-401 *et seq.* (the "CADA"), discrimination on the basis of sex is prohibited.  C.R.S. § 24-34-601(2)(a).  The CADA likewise prohibits retaliation.  *Id.* at (2.5).

186.    HHS is a place of public accommodation as contemplated by the CADA.  *See* C.R.S. § 24-34-601 ("an educational institution").

187.    Each defendant is a "person" subject to liability as contemplated by the CADA. *See* C.R.S. § 24-34-602(1)(b); *accord* C.R.S. § 24-34-402(1)(e)(I).  To the extent that the individual defendants are shielded from liability for discriminatory conduct under federal law, if at all, they are not immune from personal liability under the CADA.

188.    Relief authorized by the CADA includes injunctive relief, C.R.S. §§ 24-34-605, 24-34-306(9), and penalties of not less than fifty dollars nor more than five hundred dollars per each violation of the CADA, C.R.S. § 24-34-602.

189.    Because each Defendant has Title IX obligations, each Defendant is culpable per violation whether by affirmative conduct or nonfeasance.  Each violation flows up the District's organizational chart because the District had actual knowledge of Mr. England's propensities but did nothing to correct the situation, despite the affirmative obligation to do so.  Hence, Mr. England acted intentionally, whereas the remaining Defendants acted with deliberate indifference.

190.    As more fully described above, the defendants violated Plaintiff's rights under the CADA by discriminating against her on the basis of sex and later retaliating against her on the basis of sex, as well as having a duty to effect Title IX and breaching that duty.

191.    As a result, Plaintiff suffered the full and equal enjoyment of the services, facilities, privileges, advantages, and/or accommodations of HHS on the basis of sex as contemplated by the CADA.  *See* C.R.S. § 24-34-601(2)(a).

I.    **COUNT TWENTY-TWO: Common-law Negligence – Against Mr. England**

192.    Plaintiff realleges all other paragraphs as if fully set forth herein.

193.    Mr. England owed a duty to HHS students, and most specifically to Plaintiff, to teach his classes and act in a non-discriminatory manner.

194.    Mr. England breached that duty, as more fully set forth above.

195.    The breach of that duty caused Plaintiff damages, including but not limited to consequential damages, for instance the cost of gas while driving to another high school, as well

as emotional stress, fear, anxiety, embarrassment, humiliation, impairment of the quality of life, in an amount to be proven at trial.

196.     Plaintiff's damages were proximately caused by Mr. England's breach of his non-discrimination duty.

> **J.      COUNTS TWENTY-THREE TO TWENTY NINE: Common-law Negligent Supervision/Retention – Against Entity Defendants and Individual Defendants Except Mr. England**

197.     Plaintiff realleges all other paragraphs as if fully set forth herein.

198.     To establish liability, the plaintiff must prove that the employer has a duty to prevent an unreasonable risk of harm to third persons to whom the employer knows or should have known that the employee would cause harm.  *Keller v. Koca*, 111 P.3d 445, 448 (Colo. 2005).

199.     While there generally is no duty to control another, *Perreira v. State*, 768 P.2d 1198, under special circumstances the law does impose a duty to protect others from injury, *id.*  A duty is imposed in such situations of nonfeasance where a special relationship exists between the defendant and a third-party wrongdoer and the potential victim of the wrongdoer's action, giving rise to an affirmative protective duty.  *Id.*

200.     In addition to the existence of a special relationship, a court may appropriately consider other factors in determining the existence and scope of a legal duty, including the foreseeability of harm from the failure to take protective action for the benefit of others.  *Id.*  Other factors include the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, the consequences of placing that burden upon the actor, and any other relevant factors based on the competing individual and social interests implicated by the facts of the case.  *Id.*

201.     Here, there is a special relationship among the parties, that of school-teacher-student under Title IX.   *Accord* C.R.S. § 13-80-103.7(3.5)(a).   Additionally, Title IX and the CADA cumulatively set forth an individual, affirmative duty to eradicate sex-based discrimination in Colorado schools on the part of school employees and supervisors.   Hence, all Defendants have an affirmative duty to eradicate sex-based discrimination at HHS.

202.     Defendants, despite actual knowledge through Plaintiff's complaints regarding the sex-based discrimination above, breached that duty from and individual and entity level.   The entity Defendants were required to conduct a Title IX investigation and place Mr. England on paid administrative leave before he could retaliate against Plaintiff, which he ultimately did.

203.     The breach of the nondiscrimination duty caused Plaintiff to suffer damages.

204.     Plaintiff's damages were proximately caused by Defendants' nonfeasance.

### K.      COUNT THIRTY: Declaratory and Injunctive Relief

205.     Plaintiff realleges all other paragraphs as if fully set forth herein.

206.     This is a civil rights suit in part requesting declaratory relief and injunctive relief pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201-2202 brought by Plaintiff to enjoin the discriminatory conduct alleged above.

207.     As evidenced by the District's official results from its internal investigation and this Complaint, an actual controversy exists between the parties as to whether the Defendants violated Title IX, and therefore an actual justiciable controversy is involved.

208.     Plaintiff requests declaratory judgment enter in her favor and against the Defendants that: Defendants' rules, regulation, policy, and procedures are unconstitutional and

void; and Defendants have under color of law and deprived her of her rights, privileges, and immunities as guaranteed by the Constitution and Laws of the United States.

209.     Plaintiff further requests that the Court: (1) issue a temporary restraining order and a preliminary injunction pursuant to F.R.C.P. 65, ordering Defendants, their officers, agents, employees, successors, attorneys, and all those in active concert or participation with them to refrain immediately and pending the final hearing and determination of this action from discriminatory conduct; (2) issue a permanent injunction perpetually enjoining and restraining Defendants, their officers, agents, employees, successors,  attorneys, and all those in active concert or participation with them, of the conduct complained; (3)   award to Plaintiff costs and disbursements, as well as reasonable attorney's fees; and (4) award Plaintiff such other and further relief as this Court may deem proper, including but not limited to requiring Defendants to effect proper training to prevent the recurrence of such conduct in their hiring, firing, training and educational policies and procedures.

210.     Plaintiff, requests that judgment enter in her favor and against the Defendants jointly and severally, in an amount to be determined by a judge or jury and that the Court also award the Plaintiff her legal fees and costs incurred in pursuing this action.

## VI.     DAMAGES

211.     The Defendants' discriminatory and retaliatory conduct described above have caused the plaintiff the following damages:

    a.   Emotional upset, stress, and anxiety in an amount to be established at trial; and

    b.   Out-of-pocket expenses, litigation costs, and attorney fees in amounts to be established at trial.

212.    Defendant's violation of Title IX was willful, entitling the plaintiff to an award of punitive damages to the fullest extent permitted by law.

## VII.    REQUEST FOR RELIEF

Plaintiff requests that the court enter judgment in her favor and against Defendants as follows:

213.    Awarding the Plaintiff general damages for emotional distress in an amount to be established at trial;

214.    Punitive damages, pursuant to 42 U.S.C. § 1981, 2000(e), in the maximum amount permitted by law;

215.    Awarding the Plaintiff statutory and reasonable attorney fees, litigation expenses, and costs incurred in this action;

216.    Awarding the Plaintiff prejudgment interest;

217.    Declaratory relief; and

218.    Awarding the Plaintiff any additional and further relief that the court finds equitable, appropriate, or just.

***PLAINTIFF REQUESTS A JURY ON ALL ISSUES SO TRIABLE***

s/ Igor Raykin
Igor Raykin, Esq.
Kishinevsky & Raykin, Attorneys at Law
2851 South Parker Road, Suite 150
Aurora, CO 80014
Telephone: (720) 748-8888
E-mail: igor@coloradolawteam.com
Attorney for Plaintiff